**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **ROBERT JACKSON, JOSEPH McGRATH, and DERRELL SMITH** | ) ) ) | |
| **Plaintiffs,** | ) ) | |
| | ) | **No. 06 C 0493** |
| **v.** | ) ) | **HONORABLE DAVID H. COAR** |
| **SHERIFF OF COOK COUNTY, COOK COUNTY, ILLINOIS and DIRECTOR, CERMAK HEALTH SERVICES,** | ) ) ) ) | |
| **Defendants.** | ) ) | |

**MEMORANDUM OPINION AND ORDER**

The parties to this action are: Plaintiffs Robert Jackson ("Jackson"), Joseph McGrath

("McGrath"), and Derrell Smith ("Smith") on behalf of a certified class (collectively "Plaintiffs

or "the class"); Defendant Sheriff of Cook County ("Sheriff"); and Cook County of Illinois

("Cook County") along with the Director of Cermak Health Services ("Cermak"), an operating

unit of the Cook County Bureau of Health (collectively "Cermak Defendants"). Now before this

court are the following motions: Plaintiffs' Motion for partial summary judgment on liability

(Doc. No. 98); Defendant Sheriff's Motion for Summary Judgment (Doc. No. 103); Defendants

Cermak and Cook County's Motion for Summary Judgment (Doc. No. 104); and Defendants'

motions to dismiss (Doc. Nos. 30, 35).[1] For the reasons stated below, the motions for summary

---

[1]The parties have also filed motions to strike portions of the Rule 56.1 statements (Doc. Nos. 129, 163). To the extent that the evidence disputed in those motions was not determinative in deciding the motions for summary judgment, these motions are DENIED as moot.

judgment are DENIED, and Defendants' motions to dismiss are DENIED in part and
GRANTED in part.

## BACKGROUND

The named Plaintiffs represent a class of former inmates of the Cook County Jail who
were subjected to a screening test for sexually transmitted diseases during the facility's intake
process.

Following a bond hearing, all pre-trial detainees admitted to the jail were taken to the
Receiving, Classification, Diagnostic Center ("RCDC") for intake into the facility. The medical
testing portion of this process included x-rays, a medical history, and a urethral swabbing used to
screen for chlamydia and gonorrhea ("STD screening"). Each prisoner would enter the STD
screening room one by one and stand behind a privacy screen, where a Cermak certified medical
technician ("CMT") was waiting to execute the swabbing itself. The CMT asked each prisoner
to lower his pants, inserted a cotton swab two to four centimeters into the prisoner's penis,
rotated the swab, and extracted it in order to collect the required sample for testing. Some
aspects of the process varied from prisoner to prisoner, such as whether or not the prisoner's
penis was held during this process and, if holding was necessary, whether the CMT or the
prisoner did the holding. CMTs wore gloves at all times when in contact with the prisoners,
although the frequency with which they changed these gloves and the ultimate purpose for
wearing them is in dispute. In addition, it is also in dispute whether or not the procedure was
conducted over a garbage can in order to catch possible discharge during the procedure.

Each prisoner was asked to sign a release and consent form for the medical procedures,
which included the following language: "I consent to a medical and mental health history and

physical including screening for tuberculosis and sexually transmitted diseases as part of the intake process of the Cook County Jail." *See* Resp. to Cert. Mot. Ex. A at 18, Ex. B at 16, Ex. C at 17. In at least some instances these forms were signed after the screening process, rather than before. Some parties have claimed to have encountered physical coercion themselves or witnessed it being applied to others by jail guards. It is generally unclear what level of knowledge of the procedure prisoners had as they began the swabbing procedure, for although there was an informational poster in place and some CMTs would solicit questions or provide information regarding the process, the degree of understanding of prisoners remains unclear.

Cermak is a division of the Cook County Bureau of Health and is therefore distinct from the Sheriff who was responsible for running Cook County Jail. Cermak employees entered the jail in order to conduct these intake tests and executed all aspects of the screening itself. However, because the screening took place inside the jail, the process was a collaborative one, Rodriguez Dep. at 43, with jail staff standing nearby at all times in order to ensure security and forward progress. A general order promulgated by the Sheriff supports the use of medical screening during intake, stating that all admitted prisoners should go through such a process.

Plaintiffs filed a complaint citing violations of their constitutional rights under the Fourth and Fourteenth Amendments pursuant to 28 U.S.C. § 1983, which took its final form as of February 1, 2006 (Docket No. 7). In that complaint, Plaintiffs claim that the search violated their constitutional rights, protected under 42 U.S.C. § 1984, and that the manner in which the test was conducted was calculated to spread disease. On December 14, 2006, this court certified a class made up of: "All male prisoners at the Cook County Jail who, on and after January 27,

2004, was [sic] subjected to the non-consensual insertion of a swab into his penis as part of his admission to the jail." (Docket No. 101).

## LEGAL BACKGROUND

A party seeking summary judgment has the burden of showing, through "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that there are no genuine issues of material fact that would prevent judgment as a matter of law. Fed. R. Civ. P. 56(c). A genuine issue of material fact exists where "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511 (1986). On a motion for summary judgment, courts "must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party." *Allen v. Cedar Real Estate Group, LLP*, 236 F.3d 374, 380 (7th Cir. 2001).

Even so, the nonmoving party may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits; rather, he must go beyond the pleadings and support his contentions with proper documentary evidence. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In order to successfully oppose a motion for summary judgment, the non-movant must do more than raise a "metaphysical doubt" as to the material facts, *see Wolf v. Northwest Ind. Symphony Soc'y*, 250 F.3d 1136, 1141 (7th Cir. 2001) (citation and quotation omitted), and instead must present definite, competent evidence to rebut the motion, *see Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001); Fed. R. Civ. P. 56(c). In ruling on a motion for summary judgment, the Court must decide, based on admissible evidence, whether any material

dispute of fact exists that requires a trial.  *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).

Rule 56(c) mandates the entry of summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.  A non-moving party who bears the burden of proof on a specific issue must demonstrate by specific factual allegations that there is a genuine issue of material fact in dispute.  *McMillian v. Svetanoff*, 878 F.2d 186, 188 (7th Cir. 1989).  This evidence provided by the non-movant must be sufficient to enable a reasonable jury to find in his or her favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Celotex*, 477 U.S. at 323.

Mere allegations in the pleadings, unsupported by record evidence, cannot create an issue of fact defeating summary judgment.  *Burrell v. City of Mattoon*, 378 F.3d 642 (7th Cir. 2004).  The Seventh Circuit has also made it clear that "self-serving affidavits, without any factual support in the record, are insufficient to defeat a motion for summary judgment."  *Palmer v. Marion County*, 327 F.3d 588 (7th Cir. 2003) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) as stating that "[t]he object of [Rule 56(e) ] is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit."); *see also Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) (clarifying that such evidence is valid to the extent that it is "based on personal knowledge and [sets] forth specific facts showing that there is a genuine issue for trial").

# ANALYSIS

This Court now considers the possibility that the STD screening represents an unconstitutional search or invasion of privacy and, if it is unconstitutional, who is responsible for the violation. As an initial matter, it should be noted that this case has proceeded to this stage under a particular formulation. At certification, Plaintiffs maintained an intent "to show in their impending motion for summary judgment that the totality of circumstances at the receiving unit makes it impossible for anyone to give a valid consent to the insertion of the urethral swab." Therefore, to the extent that Plaintiffs' assertions represent unique accounts of individual experiences in the intake process, they are largely irrelevant to a determination of the summary judgment motions; to the extent that the conditions and experiences within the RCDC are not common to the class as a whole, they are either irrelevant to the suit as it now stands or urge reconsideration of certification.

## *Applicable Constitutional Principles*

This case centers on whether the urethral swab that was administered to all admitted prisoners amounts to an impermissible search. "There is no principle more firmly rooted in our constitutional jurisprudence than that warrantless search is presumptively illegal." *U.S. v. Gamble*, 473 F.2d 1274, *1276 (7th Cir. 1973). In addition, inmates have a constitutional interest in being able to decline unwanted medical procedures. *Cruzan v. Dir. Missouri Dep't of Health*, 497 U.S. 261, 278-79, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990); *Washington v. Harper*, 494 U.S. 210, 221-22, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990).

Defendants claim that the due process protections of the Fourteenth Amendment should be applied to this case instead of the Fourth Amendment analysis that Plaintiffs have urged. *See,*

*e.g.,* Cermak Defs.' Mot. to Dismiss Mem. at 3-7. Defendants are correct that Plaintiffs' cited cases do not unequivocally support the application of the Fourth Amendment to this case. *See Sullivan v. Bornemann*, 384 F.3d 372 (7th Cir. 2004) (distinguishing restraint of a prisoner, to which Fourth Amendment was applied, and forced catheterization, which required due process analysis). However, Plaintiffs' filings do not limit themselves to the Fourth Amendment analysis, as Defendants claim, but rather assume that both or either protections might be applicable. Corr. Am. Compl. ¶ 11. In subsequent filings, all parties have focused a great deal of energy on Fourth Amendment law. That approach was valid.

The Fourth Amendment provides the appropriate standard by which to consider whether the STD screening was constitutional. Courts have applied Fourth Amendment protections to the collection of bodily substances for analysis or the intrusive inspection of a plaintiff's body when performed on an individual.[2] *See, e.g., Schmerber v. California*, 384 U.S. 757, 768, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) (applying the Fourth Amendment to the non-consensual drawing of blood). Fourth Amendment analysis has also been upheld in cases where the intrusion was performed on a universal or class-wide basis. *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 616 (1989) (upholding Fourth Amendment analysis of the drawing of blood, use of a breathalyzer, and collection and testing of urine performed on all railroad employees); *Bell v. Wolfish*, 441 U.S. 520, 60 L. Ed. 2d 447, 99 S. [CITE] . 1861 (1979)

---

[2]Defendant Sheriff has attempted to distinguish *Schmerber* and other applications of Fourth Amendment to prisoner searches on the grounds that it involved an ongoing criminal investigation. Sheriff's Summ. J. Resp. at 5. However, in that brief Sheriff goes on to consider several different instances in which the analysis was applied to cases similar to the instant one, and though there is a distinction between the manner in which criminal investigations and prison needs contend with the demands of the Fourth Amendment, those differences are properly subsumed under the "special needs" analysis discussed below.

(post-visitation body cavity search in prison); *Forbes v. Trigg*, 976 F.2d 308 (7th Cir. 1992) (post-visitation urine analysis in prison). However, it is also true that forcible or unwanted medical procedures have been scrutinized on a due process basis, most often when performed on an individual. *See, e.g., Cruzan*, 497 U.S. 261.

The STD screening in question falls somewhere between the search procedures to which Fourth Amendment analysis applies and the medical procedures that typically require due process analysis. *See* Cermak Defs.' Facts ¶ 19(a) ("The reasons for administering the STD test are to protect the community at large, as well as to detect and treat STDs within the Cook County jail population"). However, the case is more appropriately considered as a screening measure put in place to protect the general population. Therefore, it is not inappropriate to determine the reasonableness of the procedure in light of the Fourth Amendment. *Accord Thompson v. County of Cook*, 412 F.Supp.2d 881, 890-91 (N.D. Ill. 2005) . In any event, as other courts have noted there is significant overlap in the analysis required to determine reasonableness under the Fourth and Fourteenth Amendments. Therefore, even if this Court were to apply the somewhat different standards of the Fourteenth Amendment, the analysis would still involve a fact-intensive inquiry that cannot be decided at summary judgment.

This Court now considers whether the procedure was valid as an exception to the presumption against non-consensual searches, either because (1) it was reasonable in the context in which it was performed, or (2) the Plaintiffs knowingly and willingly consented to the procedure.

<u>*Reasonable as a Matter of Special Need*</u>

The Fourth Amendment forbids only those searches and seizures that are unreasonable, as its purpose is "to constrain, not against all intrusions as such, but against intrusions which are not justified in the circumstances." *Schmerber*, 384 U.S. at 768. Therefore, this Court must first consider whether or not the testing, when viewed in the totality of the circumstances in which it was performed and any relevant penological interests, was reasonable and therefore immune to constitutional constraints.

Plaintiffs maintain that the balancing weighs in their favor because of the invasive nature of the test and Defendants' failure to adequately define the government interest at stake. Defendants claim that their actions were done to further the health interests of the prison community and the community at large. *See* Sheriff Def.'s Resp. to Summ. J. Mot. at 8-9 ("[T]he sole purpose Cermak performs the STD test is to diagnose, treat, and control the spread of sexually transmitted diseases"; Cermak Def.'s Summ. J. Reply at 5 ("STD testing for infectious diseases has an important penological purpose."). Defendants also maintain that the test itself was minimally invasive and therefore should be treated no differently from the mandatory blood tests that have repeatedly been found valid by other courts.

Particular standards apply to plaintiff claims of constitutional deprivation in the context of legitimate incarceration. "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254 (1987). The balancing necessary to determine whether an action is reasonable is weighted in favor of prison administration in light of the important need to maintain order within a difficult environment. *Wolff v. McDonnell*, 418 U.S.

539, 556, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974) ("prison administrators should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."). This reflects the restriction of rights intrinsic to a prisoner's incarceration. *See Hudson v. Palmer*, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984) ("Loss of freedom of choice and privacy are inherent incidents of confinement."); *see also Madyun v. Franzen*, 704 F.2d 954, 958 (7th Cir. 1983) ("[W]hile inmates are not stripped of their constitutional rights at the prison gate, it also is true that these rights properly are subject to a much greater degree of intrusion than would be allowed outside the prison gate."), cert denied 464 U.S. 996, 78 L.Ed.2d 687 (1983).

Defendants can therefore minimize constitutional scrutiny – making consideration of consent unnecessary – if they can establish the reasonableness of their actions by way of a balancing test. In the context of prison medical examinations, where there is no criminal suspicion on which to base the validity of the search, the balancing centers on whether the government was acting based on a special need "beyond the ordinary law enforcement need." *Green v. Berge*, 354 F.3d 675 (7th Cir. 2004) (finding collection of DNA for the construction of a database was a valid special need) (citing *United States v. Kimler*, 335 F.3d 1132, 1146 (10th Cir.2003)). This analysis requires consideration of several factors, including: (1) the scope of the particular intrusion, (2) the manner in which it is conducted, (3) the justification for initiating it, and (4) the place in which it is conducted. *Wolfish*, 441 U.S. at 559; *see also Green v. Berge*, 354 F.3d 675, 678 (7th Cir. 2004) (applying a similar set of factors); *compare Safley*, 482 U.S. at 89-90 (considering (1) the existence of a valid rational connection between the regulation and a

justifying government interest, (2) whether there are other avenues for the exercise of the rights in question, (3) impact that accommodating the constitutional rights would have on guards, other inmates, and prison resources generally; and (4) the absence of ready alternatives); *Thompson,* 412 F.Supp.2d 881(applying *Safley* to case involving same Defendants and many of the same facts as the instant case).

The balancing of interests dictated by the special needs test is necessarily a fact-intensive inquiry, requiring the court to examine the alleged deprivation in light of the totality of the circumstances. *See Chandler v. Miller*, 520 U.S. 305, 314, 117 S.Ct. 1295, 1301 (1997) ("[C]ourts must undertake a context-specific inquiry, examining closely the competing private and public interests advanced by the parties."). Searches conducted within a prison context therefore might be appropriate in some instances and inappropriate in others, depending on the reason behind them and the manner in which it is performed. *Compare, e.g., Bell v. Wolfish*, 441 U.S. 520, 559 (1979) (finding Constitutional post-visitation cavity search of felonious prisoners reasonable for safety reasons) *to Mary Beth G. v. City of Chicago*, 723 F.2d 1263, 1273 (7th Cir. 1983) (declining to uphold cavity search performed at intake on misdemeanor criminals).

As to the underlying value of the screening to the government and the public, Defendants maintain that the test was performed in furtherance of a "valid penological interest," but speak in generalities when asked to explain that interest. *See* Def.'s Reply to Facts at ¶¶ 21-23; Cermak Defs.' Facts ¶ 19(a) ("The reasons for administering the STD test are to protect the community at large, as well as to detect and treat STDs within the Cook County jail population"); Sheriff's

Facts ¶ 28(a) (same).[3] Deponents have restated and prioritized these interests, but have done little to delve further into the specific motivations. *See, e.g.,* Raba Dep. at 148-150 (stating intent was to protect the individual prisoner's health, followed by fear of outbreaks within the prison population and in the general population as additional motivations). Plaintiffs point out that the test was not a response to a particular threat posed by an outbreak in either the outside public or the jail's population. However, the underlying government interest need not be so specific or well-defined, provided the deprivation in question survives the balancing of interests involved. In addition, there is in fact evidence that STDs are transmitted within the jail, even if it does not rise to the level of an "outbreak." *See* Rodriguez Dep. at 90, 99. Finally, merely discovering the frequency of infection in the prison population could be considered a special need.

Whatever the purported interest in continuing the STD screening, the actions of Defendants do not indicate that Defendants placed great value in seeing the process performed effectively. Defendants failed to distinguish in their record keeping between those who were tested and those who were not, which would appear to have a significant impact on the effectiveness of the procedure. In addition, Defendants appear unconcerned by the fact that workers at times failed to apply the test due to resource constraints, Sheriff Def.'s Resp. Facts ¶ 21, and currently, Cermak is not performing the test at all.[4] *See* Raba Dep. at 75-81. It could

---

[3]It is also worth noting that this is the second proceeding in which the Defendants have been given the opportunity to explain their interest in seeing the test performed, and in both cases they have had difficulty showing a compelling need that might counterbalance the prisoners' constitutional rights.

[4]While the threat of the instant lawsuit is perhaps a valid reason to terminate the practice, the apparent lack of effort in finding an alternative to the urethral swab suggests that the

reasonably be inferred from these gaps in the use of the screening test, as well as its ultimate termination, that STD screening was not a high priority in the jail.

Defendants maintain that the magnitude of the constitutional deprivation is low, so that any balancing test used to analyze the procedure should be decided in their favor. *See* Sheriff's Facts ¶ 26(c); Cermak Defs.' Facts ¶ 18(a). However, this argument fails to withstand any degree of scrutiny. As another court of this district found, urethral swabbing involves "invasion of one of the most intimate and sensitive parts of the male body." *Thomas*, 412 F.Supp.2d at 892 (J. Kennelly). Though Defendants look for support in cases upholding the constitutionality of involuntary blood tests, the rationale for finding blood tests minimally invasive is that drawing blood is a common and therefore expected procedure to which all parties are accustomed. *See Schmerber*, 384 U.S. at 771 ("[A] blood test was a commonplace in these days of periodic physical examinations."). It cannot be said that the forcible insertion of a cotton swab into one's penis is similarly common. In light of this, as well as the physical and social discomfort involved with the procedure, there is little to support Defendants' contention that the urethral swab test is only minimally invasive.

In addition, it appears Defendants made little if any effort to lessen the already invasive nature of the screening process. *See Skinner*, 489 U.S. at 626; *Thompson*, 412 F.Supp.2d at 892. The swabbing was done with a limited level of privacy, relying on a nominally-effective privacy screen to block the sight lines of other prisoners standing at an open doorway. *See, e.g.,* Raba Dep. at 39; *but see* Murphy-Swallow Dep. at 86-87 (comparing the level of privacy to that which is found at another hospital); Morris Second Dep. at 16-17 (claiming that each treated prisoner

underlying need is not great.

could not be observed by the others). It was performed in an area that was generally noisy and congested during intake hours. Raba Dep. at 95. There is also evidence that the STD screening can be accomplished via a less-intrusive urine analysis, even if there remain questions about such alternatives' cost and effectiveness. *See, e.g., id.* at 53-54. Therefore, any claim that this test process is minimally invasive is undermined by Defendants' failure to reduce the impact that it did have on the prisoners. As stated before, the standards of privacy and freedom from search within a prison are generally lower than that which is found in free society, but the lack of diligence or care with which the procedure seems to have been executed contradicts Defendants' claim that the procedure was an appropriate means of meeting their need.

Finally, the cost, effort, and inconvenience of ensuring that the STD screening passed constitutional muster would not be high. The easiest method of remedying the problem – ensuring a more voluntary and knowing consent procedure – would not demand significant resources. And again, though its viability is still in question, urine analysis is another means of testing for STDs that would not raise the same constitutional concerns. *See* Raba Dep. at 53-55 (acknowledging that the urine analysis is similarly effective but claiming that it is more expensive).

For all of the foregoing reasons, there is insufficient evidence for determining as a matter of law that the STD test is a reasonable search warranted by a special governmental need. On this point, it is important to keep in mind the ultimate determination that must be made in allowing the government to assert a special need: "the proffered special need...must be substantial-important enough to override the individual's acknowledged privacy interest, sufficiently vital to suppress the Fourth Amendment's normal requirement of individualized

suspicion." *Chandler v. Miller*, 520 U.S. 305, 117 S.Ct. 1295 (1997). This bar has not been reached at this stage of the proceedings.

That said, the actions of Defendants were not so unreasonable as a matter of law as to warrant granting Plaintiffs' motion for summary judgment on the issue of liability on this basis. Many of the most inflammatory of Plaintiffs' allegations – that might otherwise urge this Court to find the screening test unreasonable as a matter of law – are also some of the most vigorously contested: the degree of privacy of those undergoing the procedure; the amount and duration of the pain involved; the extent to which genital manipulation by the CMTs is required; the viability of urine analysis or other alternatives; and the impact of the test on reducing the transmission of gonorrhea and chlamydia. This Court must also be mindful of the leeway given prison administrators who are ostensibly working to support the health of the population under their charge.[5]

Questions of material fact abound. While Plaintiffs portray the process as forceful, abrupt, impersonal, unyielding, and even malicious, Defendants have presented a very different version of the events in the RCDC.[6] Final determination of whether the screening was unreasonable relies on a context-specific balancing that should not be settled as a matter of law when such significant questions remain. Defendants have largely failed to show that the procedure for testing prisoners for STDs is appropriately tailored to meet their need for public

---

[5]Though Plaintiffs have attempted to portray Defendants' motivations as punitive or otherwise hurtful, they have yet to establish this malicious intent on the part of the Defendants and therefore have not undermined this presumption.

[6]According to the account of one volunteer physician, CMTs would focus only on the younger prisoners, would ask if they wanted to have the test done, and even had some prisoners request to have it done. Raba Dep. at 88-89.

safety with a minimum of constitutional complications. At the same time, however, the standard is not high – merely establishing the frequency of STDs within a prison population could arguably be a special government need – and Defendants have put forth some evidence of societal benefit from the procedure. *See* Rodriguez Dep. at 90, 99. Finally, Plaintiffs go to great pains to establish that the STD screening was inconsistently applied, but there is no hard and fast rule that the testing must be universal in order to represent a special need. If it is found that the underlying interest of reducing STDs in the prison population was sufficiently compelling, even faulty execution of a policy to address that problem might be sufficient.

For these reasons, all parties' motions for summary judgment are DENIED with respect to whether or not the STD screening is reasonable or unreasonable as a matter of law.

<u>*Consent*</u>

Despite the fact that the swabbing procedure cannot be found constitutional or unconstitutional as a categorical matter, Defendants nonetheless prevail if they can establish that the Plaintiffs adequately consented to the procedure. *See Valance v. Wisel*, 110 F.3d 1269, 1279 (7th Cir. 1997). It is fairly clear that a consent form was signed by all members of the Plaintiff class, but the nature of that consent is still at issue. In order to prove that a search was unreasonable, then, Plaintiffs must show that the consent was invalid because it was given under duress or coercion. *Id.* at 1269. Mere "acquiescence to a claim of lawful authority" does not amount to consent sufficient to avoid liability. *Bumper v. North Carolina*, 391 U.S. 543, 549 (1968). Instead, consent must be "freely and voluntarily given" in light of "the totality of the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 et seq. (1973).

Defendant maintains that the consent provided was in all cases voluntarily made by prisoners with a full understanding of the situation they faced.[7] In support, they generally point to the fact that there is little to no evidence of outright coercive language from the guards, or words of protest from Plaintiff class members. *See generally* Sheriff's Summ. J. Resp. at 5-7. Plaintiffs respond that none of the class members knew they could decline the STD screening and that they all believed failing to go through any given stage in the intake process would be met with forceful or punitive measures. *See, e.g.*, Morris Dep. at 12-15 (evidencing, through leading questions, an impression that the process was required and a lack of awareness regarding the nature of the STD test). Much of the deposition testimony on this issue appears forced and/or unclear, and Defendants have previously complained that the affidavits are written in stock language that does not appear to reflect individual impressions. However, determining such issues of credibility should take place where the facts can be brought out in an adversarial proceeding before a proper factfinder. In any event, nearly all of the Plaintiff deponents expressed some awareness of institutional pressure to acquiesce to the screening process and, in particular, the urethral swabbing. *See* Second Morris Dep. at 19 (describing the COs' language to move the crowd along, "keep walking, don't look back"). Some even claimed to have witnessed direct use of force where prisoners stepped out of line, *see, e.g.,* Roberson Dep. at 19:4-21, or suffered it themselves at some point in the intake process, *see* Ellis Dep. at 31-34.

---

[7]It appears that in some cases, prisoners actually wanted the STD screening to be performed. At least one prisoner had previously received a similar test outside the prison and actually wanted to have it done to see if he had contracted anything. *See* Second Morris Dep. at 18: 19-20.

There are several important indications that the consent was not willingly given. Though Defendants maintain that all prisoners had the option of declining the test, there is sufficient indication that they *believed* the guards would force them, creating an issue of fact on this point. Defendants concede that the guards, though not directly involved in the medical screening, nonetheless served in an enforcement capacity and were near enough to intervene where necessary. This could be perceived as a coercive threat that places the willingness of consent in question. The validity of the consent is also called into question by the fact that the prisoners were forced to make this decision toward the end of an extensive intake process, and in many instances claim they had no idea what was happening until the STD screening was actually taking place. It is uncontested that there were posters in the screening room that described the process, but this does not establish that they were correctly placed, read by members of the class, or adequate for explaining the process.

The evidence does not portray particularly coercive actions on the part of the guards. At the same time, the overall environment in which the prisoners found themselves could reasonably have given the impression that there was no choice available. Even where signed, it is possible that the consent clause represented an invalid consent to the search. In *Thompson v. County of Cook*, it was noted that the consent did not even mention the type of test that would be performed. 412 F.Supp.2d at 891. In light of the relative obscurity of the urethral swab test, vaguely referencing a test for sexually transmitted diseases would not amount to consent to such an invasive and unexpected procedure. In addition, in at least some instances the consent was not even given before the procedure was carried out. *See* Defendant Sheriff's Resp. Facts ¶ 27.

In light of these facts, summary judgment based on the presence of consent would be inappropriate.

There remain significant questions of fact regarding the consent forms, including the knowledge, willingness, and scope with which Plaintiffs' signed them. Because the adequacy of this process is necessarily a fact-intensive inquiry, a decision as a matter of law is inappropriate where material facts remain in dispute. Summary judgment in favor of Defendants on this basis is therefore DENIED.

### Liability of Sheriff of Cook County

Plaintiff has claimed that the STD screening "was conducted in accordance with an explicit policy of the Sheriff of Cook County or an explicit policy of Cermak Health Services or, in the alternative, was a practice that was so permanent and well-settled at the Cook County Jail that it constitutes a custom or usage." Corr. Am. Compl. ¶10. Defendant Sheriff has now moved for summary judgment in part on the grounds that he cannot be found liable under § 1983 in the absence of direct involvement in the STD screening process. Sheriff's Summ. J. Mot. at 4-6. It is of course true that the officers did not directly conduct the procedures in question, and that mere supervisory authority is insufficient for finding fault under § 1983. Nonetheless, the degree of supervision, and the Sheriff's adoption of a policy for facilitating the screening, could nonetheless amount to a knowing and substantial deprivation of constitutional rights.

Liability under § 1983 arises only when a defendant is personally responsible for the deprivation of which the plaintiff complains. *See Jones v. Drew*, 2007 WL 737359, at *3 (7th Cir. 2007). To be personally liable for a subordinate's acts, a supervising official "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye." *Id.* (citing

*Johnson v. Snyder*, 444 F.3d 579, 583 (7th Cir. 2006)).  Those in a supervisory position can also be found liable if a custom or policy of depriving constitutional rights exists.  *See Calhoun v. Ramsey*, 408 F.3d 375, 379 (7th Cir.2005) ("[M]unicipal liability exists only 'when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury.' ") (quoting *Monell v. N.Y. Dept. of Soc. Servs.*, 436 U.S. 658, 694 (1978)).  An unconstitutional policy or custom can take one of three forms: "(1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a 'custom or usage' with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority."  *Rashe v. Beecher*, 336 F.3d 588, 597 (7th Cir. 2003).

In Illinois, the Sheriff of Cook County and Cook County itself are distinct entities, and neither is considered an authority over the other.  The Sheriff is a county official charged with "final policymaking authority over the jail."  *DeGenova v. Sheriff of DuPage County*, 209 F.3d 973 (7th Cir. 2000) (citations omitted).  Because he or she is an elected county official, the Sheriff is empowered to execute these duties in manner "independent of and unalterable by any governing body."  *See Moy v. County of Cook*, 640 N.E.2d 926, 929 (1994) (finding no master-agent relationship between the two with respect to jail functions, based primarily on the County's inability to terminate or control).  Likewise, the County is under no obligation to bend to the Sheriff's authority.

Defendant Sheriff encouraged this Court to dismiss the suit in light of the decisions and outcome of an almost identical factual situation before Judge Kennelly.  *See Lawrence E.*

*Thompson v. County of Cook and Michael Sheahan*, 03-CV-7172. On February 7, 2006, that court granted Defendant Sheriff's Rule 50 motion to dismiss the Cook County Sheriff after the close of the Plaintiff's case. This Court is not aware of the basis for this decision, though Defendant Sheriff has submitted its memorandum corresponding to the issue in that case. It is certainly true that the instant matter is largely indistinguishable from Thompson's urethral swabbing claims before Judge Kennelly. However, that ruling was based on the record before that court, made only after the case had proceeded to trial. It cannot be said that, as a matter of law, the evidence in this case will not show that the Sheriff's policies with respect to STD screening amounted to a constitutional violation. Collateral estoppel cannot be applied to expand the findings of an individual's case to an entire class absent evidence that the class's interests were adequately represented. *Washington Group Int'l, Inc. v. Bell, Boyd & Lloyd LLC*, 383 F.3d 633, 636 (7th Cir. 2004). In terms of the facts presented, this Court cannot simply adopt another record as its own. Judge Kennelly's ruling therefore has no effect on the instant case.

Based on the record of this case, there is no proof that the Sheriff was directly involved in any of the steps in the swabbing process itself – i.e., note-taking, obtaining consent, or inserting the cotton swab – and liability for the alleged deprivation does not attach on this basis. It is also clear that the Sheriff's general administrative responsibilities do not create liability for the actions of his employees. The safety and welfare of Cermak employees and the prisoners they were testing demanded that the Sheriff's staff be closely involved in the process, as the general security of the facility of the jail and its occupants fall under the general supervisory responsibilities of the sheriff. But again, the Seventh Circuit has made clear that this general

authority of a warden is not sufficient for establishing liability. *Kelly v. Mun. Courts of Marion County, Ind.*, 97 F.3d 902, 909 (7th Cir.1996) (explaining that prison administrators are not "personally involved" in every § 1983 violation within that prison). Plaintiffs' reliance on this general supervisory responsibility and *DeGenova v. Sheriff of DuPage County*, 209 F.3d 973 (7th Cir. 2000) is therefore misplaced.

Nonetheless, the Sheriff's complicity in the screening process involves a more substantial connection between his or her policies and the alleged deprivation, which may amount to Section 1983 abuse. *See Calhoun,* 408 F.3d at 379. There was a policy in place of facilitating Cermak in carrying out its medical screening duties. If the STD screening that was a part of that process is deemed reasonable as a categorical matter, it is partly due to the jail's interest in the health and welfare of those incarcerated there, and is something that could not happen without the Sheriff's assistance. If the question becomes one of consent, the alleged coercion that would negate that consent is caused in some part by the presence and/or actions of those acting under the Sheriff's policies. The record therefore leaves open the possibility that those working for the Sheriff were responsible for the alleged constitutional deprivation because they "kn[ew] about the conduct, facilitat [ed] it, approve[d] it, [and] condone[d] it," *Hildebrandt v. Illinois Dept. of Natural Res.*, 347 F.3d 1014, 1039 (7th Cir. 2003), in acting on the Sheriff's policies.

The question of constitutionality in this case is not solely whether or not the STD screening was done or how it was done as a medical procedure. *See* Defs.' Summ. J. Resp. at 11-13. Plaintiffs' case also calls into question the surrounding environment in which it was done. Even if the Sheriff could not control the medical process itself, the jail hierarchy with respect to timing, logistics, safety, and physical security may have implicated the Sheriff's staff

in affecting the manner in which it was performed.  *See Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 927 (7th Cir. 2004) (requiring that the policy or practice must be the "direct cause" or "moving force" behind the constitutional violation).  Therefore, Sheriff's policies might be deemed  a "direct cause" or "moving force" behind the allegedly unconstitutional way in which the procedure was done, even if they were not a "direct cause" or "moving force" behind the existence of the procedure itself.

## MOTIONS TO DISMISS

Defendants had moved to dismiss this action based only on the allegations of the complaint, and those motions are largely dismissed as moot insofar as they have now been considered through summary judgment.  However, several claims should be addressed as a matter of course.  Defendants have alleged the following: the claim against Director of Cermak should be dismissed based on the redundancy of including both the Director and Cook County as Defendants; the entire suit should be dismissed due to Plaintiffs failure to allege "deliberate indifference" or a concrete injury; the Cermak Director claims qualified immunity because the case involves overcrowding issues covered under the Duran consent decree; and the entire case should be dismissed due to the collateral estoppel effects of *Duran v. Sheahan*, 74 C 2924 ("*Duran*").  For the reasons stated below, these motions are DENIED in part and GRANTED in part.

### *Standard*

On a motion to dismiss, the Court accepts all well-pleaded allegations in the plaintiff's complaint as true.  Fed. R. Civ. P. 12(b)(6).  The purpose of a 12(b)(6) motion is to decide the adequacy of the complaint, not to determine the merits of the case.  *Gibson v. City of Chicago*,

910 F.2d 1510, 1520 (7th Cir. 1990) (citation omitted).  A complaint should not be dismissed "unless it appears beyond all doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).  Any ambiguities are construed in favor of the plaintiff.  *Curtis v. Bembenek*, 48 F.3d 281, 283 (7th Cir. 1995).  However, the court need "not strain to find inferences favorable to the plaintiffs which are not apparent on the face of th[e] . . . complaint."  *Coates v. Illinois State Bd. of Ed.*, 559 F.2d 445, 447 (7th Cir. 1977).

A complaint that complies with the Federal Rules of Civil Procedure cannot be dismissed because it fails to allege facts.  The Rules require simply that the complaint state a claim, rather than plead facts that would establish the validity of that claim.  *Higgs v. Carver*, 286 F.3d 437, 439 (7th Cir. 2002).  "All that need be specified are the bare minimum facts necessary to put the defendant on notice of the claim so that he can file an answer."  *Id.* (citing *Beanstalk Group, Inc. v. AM Gen. Corp.*, 283 F.3d 856, 863 (7th Cir. 2002)).  The Seventh Circuit has ruled that stating a claim in federal court requires only "a short statement, in plain (that is, non-legalistic) English, of the legal claim."  *Kirksey v. R.J. Reynolds Tobacco Co.*, 168 F.3d 1039, 1041 (7th Cir. 1999).  Plaintiffs "don't have to file long complaints, don't have to plead facts, don't have to plead legal theories."  *Id.*  "At this stage of the litigation, we are concerned not with what plaintiff did or did not show, but rather with what plaintiff did or did not allege."  *Bworn v. Budz*, 398 F.3d 904, 914 (7th Cir. 2005).

Complaints need not plead law or match facts to every element of a legal theory.  *Bennett v. Schmidt*, 153 F.3d 516, 518 (7th Cir. 1998); *see also Scott v. City of Chicago*, 195 F.3d 950, 952 (7th Cir.1999); *Hefferman v. Bass*, 2006 WL 2973677, at *3 (7th Cir. 2006) (stating that it is

not necessary to "allege facts supporting each of the elements of the claim"). Rather, Plaintiff must simply plead "sufficient facts...to allow the court and the defendants to understand the gravamen of the plaintiff's complaint," *Doherty v. City of Chicago*, 75 F.3d 318 (7th Cir. 1996). In order to determine whether this requirement has been met, the court may consider facts alleged in the related state action. *See Henson v. CSC Credit Servs.*, 29 F.3d 280, 284 (7th Cir. 1994).

## Analysis

Cermak Defendants argued that Plaintiffs allege no actual injury amounting to a constitutional deprivation, and that the lack of consent or other failures amount to mere negligence that cannot be brought under Section 1983. Cermak Defs.' Dismiss Mem. at 9. However, in attempting to prove this point Cermak Defendants conflate "serious deprivation" of a constitutional right – which is required – with the presence or absence of a physical injury – which is not. *See, e.g., Rowe v. Shake*, 196 F.3d 778, 781 (7th Cir.1999) ("a prisoner is entitled to judicial relief for a violation of his First Amendment rights aside from any physical, mental, or emotional injury he may have sustained."). This argument is therefore unavailing.

Defendant Director of Cermak has questioned whether he or she is properly included as a Defendant in this case. Departments within a governing body generally lack the required separate legal existence to be held individually accountable. *Jordan v. City of Chicago, Dept. of Police*, 505 F.Supp. 1, 4 (N.D.Ill.1980). The question of Cermak's independence from the County of Cook, and therefore the propriety of holding both of these Defendants liable in the instant case, has been disputed before. *See Williams v. Fairman*, 1995 WL 571729 (N.D.Ill. 1995). Other courts have found that Cermak is a subservient division of Cook County, and that

Cermak's officers cannot be held liable concurrently with the County itself. *See Glass v. Fairman*, 992 F.Supp. 1040, 1043 (N.D. Ill. 1998); *Williams v. Fairman*, 1996 WL 164289, at *2 (N.D. Ill. 1996) (finding that the relevant ordinance "clearly defines Cermak as being a department within the County of Cook" and concluding that "Cermak lacks the capacity to be sued, and should be dismissed from this case").

Plaintiffs have argued that Defendant's argument on this point "is without merit because plaintiffs allege that the Director (and not Cook County) shares responsibility with the Sheriff for the challenged practice." Pl.'s Opp. to Mot. to Dismiss at 6. However, this is irrelevant in light of the fact that the Director stands as a defendant only in his or her official capacity and official capacity liability is indistinguishable from that of the ultimately responsible governmental body. *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) (citations omitted). Plaintiff has failed to advance any other arguments regarding this issue. They have conceded that Cermak is "a division of the Cook County Bureau of Health Services," Pls.' Summ. J. Mem. at 2, which in turn is a division of Cook County for purposes of attributing liability. Insofar as the case has been brought against the Director of Cermak in his or her official capacity and the County is ultimately responsible for the policies of his position, Defendant Director of Cermak's motion to dismiss is GRANTED.

The remaining arguments in Defendants' motions to dismiss are unavailing. The *Duran* decree has no collateral estoppel effects on this court as, according to its terms, it is only binding on future equitable actions, *Martin v. Davies*, 917 F.2d 336 (7th Cir. 1990), regarding a particular range of overcrowding issues, *Walker v. County of Cook*, 2006 WL 2161829, at *3 (N.D. Ill. 2006). The instant case seeks only damages and was not an issue considered in or

encompassed by *Duran's* consideration. Defendants requests for qualified immunity are out of place, as Defendants are appearing only in their official capacities. *Ruffino v. Sheahan*, 218 F.3d 697, 700 (2000)("... it is well established that the qualified immunity doctrine does not apply to official capacity cases"). Therefore, all remaining motions to dismiss are DENIED.

## CONCLUSION

For the foregoing reasons, Plaintiffs' and Defendants' motions for summary judgment are DENIED, and Defendants' motions to dismiss are GRANTED in part and DENIED in part.


Enter:


/s/ David H. Coar
David H. Coar
United States District Judge

Dated: **March 23, 2007**