

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ROBERT JACKSON, | |
| Plaintiff, | No. 06 C 0493 |
| vs. | Judge David H. Coar |
| SHERIFF OF COOK COUNTY, and COOK COUNTY, ILLINOIS, | Magistrate Judge Jeffrey Cole |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

The defendants, Sheriff of Cook County, and Cook County, Illinois, have moved for the entry of a protective order "with regards to a class discovery issue." (*Sheriff of Cook County's Motion for Protective Order*, at 1). The problem, however, is that the defendants are not raising a "discovery issue" at all; instead, as defendants finally conceded in their "Supplemental Brief in Support of Motion for Protective Order," they are seeking a change of Judge Coar's certification of the class. As such, it is beyond the scope of Judge Coar's referral for all discovery disputes and discovery motions, and I have no authority to grant it.

On December 14, 2006, after briefing and a hearing on the question of class certification, Judge Coar issued a Memorandum Opinion and Order granting the plaintiffs' motion for class certification under Fed.R.Civ.P. 23(b)(3). The class is defined as:

> All male prisoners at the Cook County Jail who, on and after January 27, 2004, was [sic] subjected to the non-consensual insertion of a swab into his penis as part of his admission to the jail.

(*Memorandum Opinion and Order*, 12/14/06, at 2-3). Judge Coar reiterated this as the definition

of the class as recently as March 23, 2007. (*Memorandum Opinion and Order*, 3/23/07, at 3-4).

The defendant's original 3-page motion sought a protective order "limiting class discovery" to certain inmates, who were defined by age and dates of admission into the jail. (*Sheriff of Cook County's Motion*, at 3). The motion argued that evidence provided in discovery had shown that only certain male prisoners at the Cook County Jail had been subjected to the non-consensual insertion of a swab into his penis as part of his admission to the jail after January 27, 2004, and thus, the discovery that was being sought in order to provide notice to the class, was overly broad and overly burdensome. Concerned that unless the class were redefined, the costs of mailing would be (needlessly) excessive and that there would be a substantial number of false claims (how many, the defendants could not begin to guess), the motion sought a protective order, the effect of which would be to provide notice only to individuals of a certain age who had been admitted to the jail during certain defined periods, as opposed to all those who had entered the jail after January 27, 2004, as Judge Coar's class certification seemed to require.

Apart from the superficiality of the presentation – the motion cited no cases and did not discuss the principles applicable to issuance of protective orders, *see Autotech Technologies Ltd. Partnership v. Automationdirect.com, Inc.*, 235 F.R.D. 435, 439-40 (N.D.Ill. 2006); *Silva v. Fortis Benefits Ins. Co.*, 437 F.Supp.2d 819, 827 (N.D.Ill. 2006) and thus did not go far to supporting the argument being advanced, *see Kyles v. J.K. Guardian Sec. Services*, 236 F.R.D. 400 (N.D.Ill. 2006) – the motion failed to recognize a critical problem lurking beneath the surface. Judge Coar had defined the class as "all male prisoners at the Cook County Jail who, on and after January 27, 2004, was subjected to the non-consensual insertion of a swab into his penis as part of his admission to the jail." To grant what appeared to be a discovery motion would effectively redefine the class as

2

defined by Judge Coar and would result in an underinclusive notice to the class as Judge Coar envisioned it.

Members of a Rule 23(b)(3) class must receive reasonable notice and an opportunity to opt out; that is an absolute and unambiguous jurisdictional requirement for a court to exercise jurisdiction over those class members. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974); *Smith v. Shawnee Library System*, 60 F.3d 317, 321 (7th Cir. 1995); *Gert v. Elgin Nat'l Indus., Inc.*, 773 F.2d 154, 159-60 (7th Cir.1985). Thus, when notice is not sent to a Rule 23(b)(3) class until after the resolution of a motion for summary judgment, the party moving for summary judgment risks that the resulting order may not be binding on the absent class members. *See Jefferson v. Ingersoll Int'l Inc.*, 195 F.3d 894, 896-97 (7th Cir.1999); *Murray v. E*Trade Financial Corp.*, 240 F.R.D. 392, 400-401 (N.D.Ill. 2006); *Williams v. Lane*, 129 F.R.D. 636, 647-648 (N.D.Ill. 1990). Defendants apparently risked as much here, moving for summary judgment while apparently delaying notice to the class as defined. *See Shawnee Library System*, 60 F.3d at 322 (defendants resisted motions to notify class and when summary judgment was granted, it was not effective as against the entire class); *compare Mortimer v. Baca*, 2005 WL 3497817, *4 (C.D.Cal. Declaration. 20, 2005)(sheriff's department has the ability to compile a list of individuals who meet the class definition in this case).

Concerns similar to those defendants raise here – that notice to a class, which is broadly defined because of the difficulty in defining it more narrowly (and obviously more broadly than the plaintiffs would like) – were addressed by Judge Coar in another context by reference to the Seventh Circuit's finding that class actions should not be defeated "'because the prospective refunder has taken so much from so many that complexities arise.'" *In re Sulfuric Acid Antitrust Litigation*, 2007

3

WL 898600, *9 (N.D.Ill. Mar. 21, 2007)(Coar, J.).[1]

At my suggestion, the defendants filed a "Supplemental Brief in Support of Motion for Protective Order." While the Supplemental Brief still seeks a protective order, it effectively concedes that, at bottom, what is sought is a redefinition of the class so that it conforms to what the defendants claim has been revealed by the evidence in the case. (*Supplemental Brief*, at 1). The redefined class, which the defendants contend is necessitated by the evidence adduced in discovery, would limit class notification – which is simply an indirect way of redefining a class – to:

>  a. All inmates entering the Cook County Jail between June 24, 2004 and July 29, 2004,
> 
>  b. All inmates aged 25 years old and younger entering the Cook County Jail between April 1, 2005 up to September 1, 2005,
> 
>  c. All inmates aged 35 years old and younger entering the Cook County Jail between September 1, 2005 up to September 1, 2006,
> 
>  d. All inmates aged 25 years old and younger entering the Cook County Jail between September 1, 2006 and January 25, 2007.

(*Defendants' Supplemental Brief*, at 5).

There is no doubt that after certifying the class, a court retains broad power to modify the class definition if it believes that it is inadequate. *Gates v. Towery*, 456 F.Supp.2d 953, 966 (N.D.Ill. 2006); *Buycks-Roberson v. Citibank Fed. Sav. Bank*, 162 F.R.D. 322, 328-29 (N.D.Ill.1995). It can

---

[1] This is but a particularized application of the overarching principle that difficulties in proof occasioned by an adversary's own conduct does not result in a kind of immunity for the wrongdoer. *Compare Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 688 (1946)(employer can't complain about inexactitude of damage award where he failed to keep records in accordance with statutory requirements); *J. Truett Payne Co., Inc. v. Chrysler Motors Corp.*, 451 U.S. 557, 566 (1981); *United States v. Cohen*, 145 F.2d 82 (2nd Cir. 194)(L.Hand, J.)("It is a strange conception of justice that, if one only tangles one's crimes enough one gets an immunity because the result if beyond the power of a jury to unravel.").

do so if at any time before a final judgment on the merits if the evidence or the legal principles establishes that the class definition is too broad. Fed.R.Civ.P. 23(c)(1); *In re Sulfuric Acid Antitrust Litigation*, 2007 WL 898600 at *9; *Buycks-Roberson*, 162 F.R.D. at 329. But it scarcely follows from these general principles, that I am authorized to grant the requested relief.

Federal courts are, as the Seventh Circuit continually cautions, courts of limited jurisdiction, which must be ever-vigilant to ensure that jurisdictional limits are not transgressed.[2] The jurisdiction of magistrate judges is even more limited than that of Article III judges. The answer to Judge Posner's rhetorical question in *Smoot* – "Does it really matter if federal courts decide on the merits cases that they are not actually authorized to decide?" – is every bit as important to magistrate judge jurisdiction as it is in the context in which he posed it. For magistrate judges, no less than for district judges, there must be strict adherence to the rules that seek to ensure that federal courts do not exceed the limits that the Constitution and federal statutes impose on their jurisdiction.

My power in this and all other matters is defined and limited by 28 U.S.C. § 636. *Roell v. Withrow*, 538 U.S. 580, 585 (2003); *Pinkston v. Madry*, 440 F.3d 879, 893 (7th Cir. 2006). *See generally* Jeffrey Cole, Magistrate Judge Practice, Chap. 10, §10.2, Illinois Institute of Continuing

---

[2] See, e.g., *Smoot v. Mazda Motors of America, Inc.*, 469 F.3d 675 (7th Cir. 2006)(Posner, J.); *Blue Cross and Blue Shield Assn. v. American Express Co.*, 467 F.3d 634 (7th Cir. 2006)(Easterbrook, J.)("If these lawyers were physicians, their patients would be dead."). Some lawyers have objected to what they see as the needless stridency of the language of the opinions and the excessiveness of the results. *See* Howard J. Bashman, Commentary: *Have 7th Circuit Judges Gone Off the Deep End?*, at http://www.law.com/jsp/article.jsp?id=1165582068191. One blogger has predicted a gloomy future for appellate practice in the Seventh Circuit: "The *Mazda/Smoot* decision is a scary warning to all federal appellate practitioners. Also scary is the 20 minute audio of the oral argument, in which Judges Posner and Easterbrook flay both counsel like they were pulling the wings off of a fly." www.indianalawblog.com/documents/RG-9.pdf. These sorts of over-reactions have little to commend them and conveniently overlook the court's repeated warnings about rule violations that for too long have gone unheeded – at least in the Court of Appeal's view. *Smoot*, 469 F.3d at 677.

5

Legal Education (Federal Civil Practice 2006). Section 636(b)(1)(A) provides in pertinent part:

> (A) a judge may designate a magistrate judge to hear and determine any pretrial matter pending before the court, except a motion for injunctive relief, for judgment on the pleadings, for summary judgment, to dismiss or quash an indictment or information made by the defendant, to suppress evidence in a criminal case, to dismiss or to permit maintenance of a class action, to dismiss for failure to state a claim upon which relief can be granted, and to involuntarily dismiss an action.

I need not decide whether a motion to redefine a class falls within a motion "to dismiss or permit maintenance of a class action" and thus is inappropriate for determination by me, although it would appear that it is. What is certain is that resolution of the motion, which is determined not by its title but by its substance, *Guyton v. United States*, 453 F.3d 425, 426 (7th Cir. 2006), depends upon redefining the class and thus involves infinitely more than discovery matters, which are all that Judge Coar has referred here. My authority in this case is canalized by the scope of that referral. As defendants have now admitted, this is not a discovery dispute or discovery motion, I have no authority to rule on the motion.

In support of the argument that I have authority to enter an order that effectively would change the class definition, the defendants rely upon "*Jarmesek* [sic] *v. Acromed*, 1995 U.S.Dist. LEXIS 18245 (N.D.Ill. December 6, 1995)." (*Defendants' Supplemental Brief*, at 2). The citation of the case – presumably *Jamasek v. Acromed* – is mystifying, for it does not discuss class certification, class definition, or class actions at all. Nor does it address the authority of a magistrate judge to make such rulings. In addition, the case does not cite, as the defendants suggest, *Baxter v. Savannah Sugar Refining Corp.*, 1968 U.S.Dist. LEXIS 8719 (S.D.Ga. 1968). *See Jamasek v. Acromed Corp.*, 1995 WL 733466 (N.D.Ill. 1995).

No doubt recognizing the jurisdictional problem underlying the requested relief, the

6

defendants alternatively suggest that I issue a report and recommendation on the matter pursuant to §636(b)(1)(B) which provides:

> (B) a judge may also designate a magistrate judge to conduct hearings, including evidentiary hearings, and to submit to a judge of the court proposed findings of fact and recommendations for the disposition, by a judge of the court, of any motion excepted in subparagraph (A), of applications for posttrial relief made by individuals convicted of criminal offenses and of prisoner petitions challenging conditions of confinement.

This request exceeds the defendants' authority as parties and my authority as well. Requests for a report and recommendation must come from the district court. However, a review of the evidence the defendants have marshaled to support their demand that the class defined in Judge Coar's order be modified reveals that their argument is less than convincing. The evidence consists of: 1) the deposition testimony of the head of Cermak Health Services STD Clinic, Dorothy Murphy; 2) a paper published on the inmate STD swab testing; 3) the declaration of Dr. James McAuley – who was the medical director at Cermak at the time; and 4) some 400 employee sign-in sheets from inmate intake. According to the defendants, this evidence shows that class definition ought to be pared to fit the time frame and parameters espoused in their motion. Unfortunately the evidence is, at turns, contradictory, inexact, and not particularly probative. As such, the truncated class definition the defendants propose has little to support it.

Ms. Murphy testified that "around April" of 2002, Dr. McCauley – then medical director at Cermak – discontinued STD swab testing as a part of inmate intake. (*Sheriff of Cook County's Motion*, Ex. A, Murphy Dep., p. 19). According to the paper published on the study, however, universal screening was not discontinued until nearly a year later, in March of 2003. (*Sheriff of Cook County's Motion*, Ex. B, p. 1). Dr. McAuley himself, however, indicates that the testing was not

7

discontinued until May of 2003. (*Defendants' Supplemental Brief*, Ex. 1). Once the testing was discontinued, whenever that actually might have been, the City of Chicago's Health Department became concerned and provided funding for a "Continuous Quality Improvement" project designed to determine parameters of those most at risk for STDs, as opposed to more costly universal testing. (Murphy Dep., p.21).

The CQI project began with Ms. Murphy and one of the doctors reviewing 200 treatment records from either 2002 or 2003 – she could not recall which year – in order to develop a criteria for screening. (*Id.*, p. 26-27). Sometime in June of 2004 – again, Ms. Murphy could not recall exact dates – testing began on all male detainees, and continued through July of 2004. (*Id.*, pp. 28-29). According to the published study, the date was June 24th. (Ex. B; p. 1). It is not entirely clear from Ms. Murphy's deposition testimony that the screening ended in July 2004, but again, the paper indicates that the screening concluded on July 29, 2004. (Ex. B, p. 1). Ms. Murphy recalled that some 5900 detainees were screened that month, although she allowed that she was on vacation for part of the time at issue. (Murphy Dep., pp. 36-37). The study states that 5634 detainees were screened. (Ex. B, p.2).

Ms. Murphy testified that, after the study, "[i]t was not the practice and the policy to do universal male STD screening," but that a detainee would be tested if he came through with "complaints of signs and symptoms of STD requiring medical attention . . . ." (Murphy Dep., P. 49). According to Ms. Murphy, universal screening apparently began again in April of 2005. (*Id.*, pp. 48-49). But, not surprisingly after the passage of time, her recollection of the parameters for the screening was less than clear:

> Q: After April of 2005, was it the practice and policy at Cermak to universally screen male detainees?

8

> A: It was the practice to universally screen male – all male detainees. It was the practice to provide focus screening for urethral swabbing to persons 35 and under and symptomatic persons.
>
> Q: For what period of time after April –
>
> A: I'm sorry, it was 25 and under. We changed it to 35 and under in September of 2005.
>
> Q: From April 1st, 2005, through September 1st, 2005, there was universal screening of male detainees 25 years old and under, is that correct?
>
> A: Uh-huh, about mid April.
>
> Q: After September 1st, 2005, to the present, has there been universal screening of male detainees using a urethral swab for those 35 years old and under?
>
> A: It was until about three months ago when we again have run into problems with financing the program. . . . again reduced screening age to 25 years and under or symptomatic, and five days a week for males and daily for females because of money.

(*Id.*, pp. 49-50). Ms. Murphy could not recall whether the date of the change was two or three months prior to her deposition, which took place on November 15, 2006. (*Id.*, pp. 50-51).

Beyond Ms. Murphy's testimony, which is less than exact at times, and the published study contradicting her recollection of the date testing was discontinued, and Dr. McCauley's statement contradicting both Ms. Murphy and the study on that date, the defendants submit copies of nearly 400 shift sign-in sheets from Cermak Health Services. (*Defendants' Supplemental Brief*, Ex. 2, pp. 00527-00913). The defendants explain that the sheets document when someone was assigned to perform STD testing, noting that there were sheets among the 400 without any "STD" notation, consistent with testimony that there were days when none was performed due to lack of supplies. (*Defendants' Supplemental Brief*, at 3).

Not clear from defendants' offering is what it proves. Although not presented in

9

chronological order, the sheets appear to span a time period from July 1, 2004 (p. 00527) to January 31, 2007. (p. 00883). Obviously, then, as that is about a 940-day time period, there is a sign-in sheet for fewer than half the days during that period. Whether testing occurred on those days – days including those on which defendants claim there was no testing – is left unaddressed. So, basically, in order to show that testing concluded at the end of July 2004, defendants submit the sign-in sheets for that month (pp. 00527-00557) – with none for the following month. The next sign-in sheet provided is from April 26, 2005. (P. 00559). Perhaps every sign-in sheet in the interim includes an "STD" notation. It is as if the defendants seek to prove that there was no swab testing outside the temporal parameters of their redefined class by withholding sign-in sheets from the days outside those parameters.

Of course the absence of evidence can, in the appropriate context, have evidentiary significance. However, the reasons for the absence must be explained, otherwise the absence is irrelevant. *See* Rule 401, Federal Rules of Evidence. The absence of an entry in records may be admissible to prove the nonoccurrence of the matter if the matter was of a kind of which a memorandum report record or data compilation was regularly made and preserved. Rule 803(7), Federal Rules of Evidence. But that is not the kind of proof adduced by the defendants. Their proof is not that records that span and include relevant time periods failed to reflect testing; rather, it is that there are no records, and from the silence of the evidentiary record I am authorized, indeed compelled, to conclude that there was no testing. But, "inferences from silence are perilous," Posner, Cardozo: A Study In Reputation, 37 (1990). *Accord United States v. Hale*, 422 U.S. 171, 176 (1975); *Coleman v. Interco Inc. Divisions' Plans*, 933 F.2d 550, 552 (7th Cir. 1991)(Posner, J.).

There is nothing to establish the method or manner of record-keeping employed in the sign-in

sheets. Perhaps STD assignments were not recorded religiously: even a cursory review of the 400 pages reveals that STD assignments were recorded in different columns. (*See, e.g.*, pp. 00620, 00622, 00625-26, 00634). There were also occasions where whoever was compiling the sheet did not bother to provide all the requested information, leaving certain columns blank, as with the equipment inventory columns which require a notation of presence *or* absence. (*See, e.g.*, pp. 00591, 00594, 00601, 00603-05, 00619-21, 00639-41, 00829-31). Perhaps, like equipment inventory, STD assignments were not noted every shift. In any event, the sign-in sheets fail to demonstrate with any certainty that testing was not performed on the days defendants contend it was not performed. The sign-in sheets prove little on their own, and perhaps less when combined with the other contradictory and inexact evidence.

## CONCLUSION

For the foregoing reasons, the defendants' motion for a protective order [# 153] is DENIED.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

DATE: 4/24/07